

FILED
2009 NOV 10 AM 11: 35
CLERK ... DISTRICT ... TEXAS
WESTERN DISTRICT ... TEXAS
BY_____

RAY CURTIS GRAHAM,

**Plaintiff,**

-vs-

Case No. A-08-CA-006-SS

RISSIE OWENS, Individually and in Her Official
Capacity as Chairperson of the Texas Board of
Pardons and Paroles; STUART JENKINS,
Individually and in His Official Capacity as
Director of the Parole Division of the Texas Board
of Pardons and Paroles; JOSE ALISEDA JR.,
CHARLES AYCOCK, CONRITH DAVIS,
JACKIE DENOYELLES, LINDA GARCIA,
JUANITA M. GONZALEZ, THOMAS G.
FORDYCE, PAMELA D. FREEMAN, TONY
GARCIA, ELVIS HIGHTOWER, JAMES PAUL
KIEL JR., EDGAR MORALES, JAMES C.
POLAND, LYNN RUZICKA, CHARLES
SHIPMAN, CHARLES C. SPEIER, and
HOWARD A. THRASHER, SR.,

**Defendants.**

---

## O R D E R

BE IT REMEMBERED on the 5th, 6th, 7th, and 8th of October 2009, the Court held a trial in the

above-styled cause and the parties appeared in person and through counsel. The case went to the jury

and the jury rendered a decision on October 8, 2009. Now pending are Defendant Stuart Jenkins

("Jenkins")' Motion for Judgment as a Matter of Law [#189]; Jenkins' Motion to Enter Judgment

[#202]; Plaintiff Ray Curtis Graham ("Plaintiff")'s Opposed Motion for Permanent Injunction [#203];

Plaintiff's Motion for Entry of Judgment [#204]; and Defendant Rissie Owens ("Owens")' Motion for

Judgment as a Matter of Law [#205]. Having considered the aforementioned motions, the case file as

a whole, the evidence introduced at trial, and the applicable law, the Court enters the following opinion and orders.

## BACKGROUND

The background of this case has been exhaustively set forth in numerous prior orders, and therefore the Court includes only a summary here. This lawsuit was filed on January 3, 2008 against defendants Rissie Owens ("Owens"), the Chairperson of the Texas Board of Pardons and Paroles (the "Board"), and Stuart Jenkins ("Jenkins"), the Director of the Parole Division (the "Parole Division") of the Texas Department of Criminal Justice, among others.

Plaintiff Ray Curtis Graham ("Plaintiff") is on parole under the Super-Intensive Supervision Program ("SISP") for violent offenders, and has a violent criminal history extending over 25 years. In 1982, during sentencing for Burglary of a Habitation and Unauthorized Use of a Motor Vehicle, Plaintiff entered a plea in bar pursuant to Texas Penal Code § 12.45(a), admitting the offense of Aggravated Rape.[1] After two parole violations and two more convictions (in 1988 and in 1993), Plaintiff was released on SISP supervision in 2003. In reviewing Plaintiff's file sometime thereafter, the Parole Division became aware that because of his plea in bar to Aggravated Rape, he was eligible for review for sex offender treatment. Thus, on November 2, 2007, the Parole Board notified him in what is commonly referred to as a *Coleman* notice that it was considering imposing sex offender conditions on his parole. The *Coleman* notice informed Plaintiff he had 30 days to respond and oppose the imposition. Plaintiff did oppose it, but on December 14, 2007 two members of the Parole Board considered his case and decided sex offender conditions should be imposed.

---

[1]The Court has already determined Plaintiff's plea in bar is not a "sex offense" within the meaning of *Coleman*. *See Coleman v. Dretke*, 395 F.3d 216, 225 (5th Cir. 2004).

As a result, Plaintiff brought this § 1983 action, complaining about the application of sex offender conditions to his parole and objecting to the process employed by Defendants to impose the conditions, which he claims violated his constitutional right to procedural due process of law. The Court initially denied the motion for injunctive relief because the record was inconclusive as to whether Plaintiff had ever been convicted of a sex offense. *See* Order of January 7, 2009 [#5] at 3-4; 6. But the Court noted the process used by the Parole Board "appears to be procedurally indistinguishable from the process found to be constitutionally inadequate" in *Coleman. Id.* at 3. On January 22, 2008, the Court held an evidentiary hearing on the matter, and denied Plaintiff's application for a temporary injunction. However, the Court expressed "grave concerns" about the fundamental fairness of the proceedings by which the sex offender conditions had been imposed on Plaintiff. *See* Order of January 24, 2008 [#11]. The Court ordered the Attorney General to forward a copy of the Court's order to the Board, and permitted Plaintiff to file an amended complaint.

In June of 2008, the Court dismissed eight of the original defendants based on extensive Rule 12 motions. *See* Order of June 23, 2008 [#40]. Subsequently, the remaining defendants (all represented by the Attorney General) filed an interlocutory appeal. But after many months, and after having two other federal judges rule adversely on the procedures of the Board of Pardons and Paroles and the Parole Board, the appeal was withdrawn. The strategy of the Attorney General in this case—to delay at all costs, and avoid a trial on the merits—was now becoming indubitable.

In December of 2008, the Court was advised that the interlocutory appeals had been dismissed and the parties indicated they were ready to proceed to a trial in this case. Thus, on March 30, 2009, the Court entered a scheduling order affirming the parties' agreed pre-trial schedule. True to form, Defendants requested to stay the trial on April 21, 2009, based on an adverse decision against them in *Meza v. Travis County, et al.*, Cause No. 1:05-CV-1008-LY (March 24, 2009). Defendants claimed

the adverse decision against them in *Meza* turned on the same issues as the present case, and therefore the present case should be stayed until the appeal of *Meza* had been completed. Defendants had apparently forgotten the plaintiffs in the two cases were not the same, and the plaintiff in this case was still under sex offender conditions, with no new hearing scheduled. Noting Defendants had had "months and months wherein a hearing could have been scheduled and consummated," the Court denied the motion to stay on May 14, 2009. *See* Order of May 14, 2009 [#101].

On May 18, 2009, the parties announced ready for trial, and a jury was selected. After opening statements, however, it became apparent with the first witness that the lawyers representing both parties were not prepared to try the case. There had been no compliance with Federal Rule of Civil Procedure 26, or with the orders of this Court requiring disclosure of witnesses and designation of expert witnesses with summaries of the expert witnesses' testimony. It was glaringly apparent under these circumstances no determination on the merits would be accomplished in trial; therefore, the Court granted a mistrial.

On August 4, 2009, the parties again appeared and announced ready for trial, and a jury was selected. The trial proceeded on the merits through August 6, 2009. During the trial the Court made the express oral finding (later commemorated in writing) that, based on the undisputed evidence, Plaintiff's constitutional right to procedural due process was violated when sex offender conditions were imposed on him in December of 2007 because Plaintiff did not receive the procedural protections required by Fifth Circuit law: he did not have an "appropriate hearing," and no finding was ever made that he constituted a "threat to society by reason of his lack of sexual control." *See Coleman v. Dretke*, 395 F.3d 216, 219 (5th Cir. 2004); *and see* Order of August 6, 2009 [#156]. Despite the fact that neither Plaintiff nor his counsel ever filed any motion with a proper evidentiary record requesting the Court to order Defendants to hold a due process hearing for Plaintiff, the Court—unable to contain its

frustration—ordered a new *Coleman* hearing be held for Plaintiff on August 10, 2009, and ordered Plaintiff be allowed to attend the hearing and be given the opportunity to make a 20-minute presentation in his defense.[2] Order of August 6, 2009 [#156]. The Court also ordered that the commissioners voting in Plaintiff's case and a court reporter must be present at the hearing. *Id.*

Before the second trial was completed, the Court again declared a mistrial on August 6, 2009. *See* Order of August 6, 2009 [#157]. This mistrial was declared at the request of Owens' counsel, on the grounds the Court had asked questions of and made comments to a witness in the presence of the jury that may have prejudiced the jury against Owens. The Court, not being able to rule out that possibility, granted the motion for a mistrial. *Id.* The Court then scheduled a third trial on the issue of damages.

Thus, on September 28, 2009, the parties selected a third jury, and the case proceeded to trial on October 5, 2009. The attorney general appeared (unbelievably) to *still* not be ready for the trial (and perhaps never would be), as one of its counsel professed not even knowing at this late stage which issues were to be tried in the case, notwithstanding the two previous mistrials, this Court's instructions at the close of the second trial, and its written orders. As the trial proceeded, the attorney general's conduct did not improve: it resulted in two findings of contempt, as one of its counsel intentionally and deliberately violated the rulings of the court in the presence of the jury, apparently attempting to provoke another mistrial.

During the October trial, Owens and Jenkins moved for judgment as a matter of law at the close of Plaintiff's case, and again at the close of the evidence. The motions were overruled except

---

[2]The parties represent the August 10, 2009 hearing was duly held, although they disagree as to whether it was conducted in accordance with the requirements of due process. The sex offender conditions were reimposed on Plaintiff following the August 2009 hearing. *See* Owens' Re. Mot. JMOL at 4.

to the issue of qualified immunity, which was carried. The jury deliberated and came to a verdict on

October 8, 2009. The jury found both Defendants had violated Plaintiff's constitutional rights, but

found Jenkins alone was entitled to qualified immunity because his actions were not unreasonable in

light of the clearly established law. *See* Jury Verdict [#200]. The jury awarded Plaintiff $15,000 for

his "mental anguish and/or loss of enjoyment of life," and $6,250 for his out-of-pocket expenses. *Id.*

The jury also found it had been necessary for Plaintiff to incur attorneys' fees in the prosecution of the

case. *Id.*

Following the trial, the parties filed the following motions, which are the subject of this Order:

Jenkins' Motion to Enter Judgment [#202]; Plaintiff's Opposed Motion for Permanent Injunction

[#203]; Plaintiff's Motion for Entry of Judgment [#204]; and Owens' Motion for Judgment as a Matter

of Law [#205].

### DEFENDANT OWENS' MOTION FOR JUDGMENT AS A MATTER OF LAW [#205]

**I.      Legal Standard for Judgment as a Matter of Law**

Judgment as a matter of law is appropriate after "a party has been fully heard on an issue during

a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary

basis to find for the party on that issue." Fed. R. Civ. P. 50(a). In evaluating such a motion, "the court

must consider all of the evidence in the light most favorable to the non-movant," and draw all factual

inferences in favor of the non-movant. *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472,

479 (5th Cir. 2008) (quoting *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 333 (5th Cir. 1997)).

The court must not make credibility determinations, weigh the evidence, or draw legitimate inferences

from the facts, as these functions are for the jury, not the court. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986). Although the court should review the record as a whole, it must disregard all

evidence favorable to the moving party that the jury is not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## II.    Discussion

In her motion for judgment as a matter of law, Owens argues there is no legally sufficient evidentiary basis to support a judgment against her in her individual capacity because (1) the evidence did not show she had any personal involvement in the constitutional violation; (2) there was no "clearly established" law which would have put her on notice she was violating Plaintiff's constitutional rights; (3) her actions were not unreasonable in light of the clearly established law; and (4) the damages in this case are not supported by the evidence. The Court will consider first whether a constitutional violation occurred in this case (which, although it was the subject of an earlier order, should be restated here). The Court then turns to whether Owens may be held individually liable for the constitutional deprivation.

### a.    Whether a constitutional violation occurred

On August 9, 2009, this Court entered an order finding, based on the undisputed evidence, that Plaintiff's constitutional right to procedural due process was violated when sex offender conditions were imposed on him in December of 2007. *See* Order of August 9, 2009 [#156]. That finding was made for the following reasons.

### (1) The *Coleman* Decision

In 2004, the Fifth Circuit issued an opinion entitled *Coleman v. Dretke*, 395 F.3d 216 (5th Cir. 2004), which considered the case of a state prisoner, Coleman, who was indicted for aggravated sexual assault of a child and indecency with a child by contact, but pled guilty to and was convicted of only misdemeanor assault. *Id.* at 219. When Coleman was released on parole, the parole panel imposed conditions requiring him to register as a sex offender and attend sex offender therapy. *Id.* When

Coleman failed to enroll or participate in sex offender therapy, his parole was revoked. *Id.* at 221. Coleman challenged that revocation, asserting the State had violated his right to due process by imposing, without advance notice or a hearing, sex offender registration and therapy as conditions of his release. *Id.*

The *Coleman* court agreed, holding the imposition of sex offender classification and conditions on a person who has not been convicted of a sex offense, without a hearing and notice, is a violation of the person's constitutional right to procedural due process. *Id.* at 222.[3] First, the court determined parolees who have never been convicted of a sex offense have a liberty interest created by the Due Process clause in not having sex offender conditions placed upon their parole. *Id.* at 222-23. The court reasoned "due to its highly invasive nature, Texas's sex offender therapy program is 'qualitatively different' from other conditions which may attend an inmate's release." *Id.* (analogizing to *Vitek v. Jones*, 445 U.S. 480 (1980)).[4] Sex offender treatment is "confrontational" and "confidentiality is not maintained"; it involves "interventions with psychopharmacological agents, polygraph exams to determine sexual history, and the use of penile plethysmographs to modify deviant sexual arousal and enhance appropriate sexual arousal." *Id.* (internal quotations omitted).

---

[3]In *Williams v. Ballard*, the Fifth Circuit recognized this holding applies equally to the requirement for registration and for sex offender therapy; in other words, "both requirements necessitate due process." 466 F.3d 330, 333 n.5 (5th Cir. 2006). Thus the fact the State no longer requires parolees who have not been convicted of a sex offense to register "does not change things." *See Coleman v. Dretke*, 409 F.3d 665, 667-68 (5th Cir. 2005) (on denial of petition for rehearing en banc) ("*Coleman II*").

[4]In *Vitek*, the Supreme Court found a state law that allowed prison officials to identify inmates as mentally ill and transfer them to mental institutions for involuntary confinement and treatment without a hearing was unconstitutional. 445 U.S. at 494. Because of the combination of stigma and compelled behavior modification treatment that result from the commitment—which goes beyond the ordinary loss of freedom suffered by inmates—the Court held the inmate had been deprived of a protected liberty interest, and thus the state was required to provide procedural protections. *Id.* at 492-94.

Accordingly, the Court determined the Due Process clause, as interpreted in *Vitek*, provided Coleman "with a liberty interest in freedom from the stigma and compelled treatment on which his parole was conditioned," and the State was therefore "required to provide procedural protections before imposing such conditions." *Id.* at 223.[5]

The Fifth Circuit did not discuss the exact procedural protections that are required at length. However, it did make clear the State may impose sex offender conditions on a parolee "only if he is determined to constitute a threat to society by reason of his lack of sexual control." *Id.* at 225. The court concluded, "[a]bsent a conviction of a sex offense, the Department must afford [a parolee] *an appropriate hearing* and *find that he possesses this offensive characteristic* before imposing such conditions." *Id.* (emphasis added). Because the state habeas court had held otherwise, the Fifth Circuit found its conclusion contravened "clearly established" federal law under AEDPA, and reversed the state district court's denial of habeas relief. *Id.* at 223-24.

### (2) Findings of Fact and Conclusions of Law as to the Constitutional Violation in this Case[6]

The undisputed evidence presented during the August trial on this case established unequivocally that Plaintiff was not given an "appropriate hearing" before the sex offender conditions were imposed on him in December of 2007, nor was the finding ever made he constituted a "threat to society by reason of his lack of sexual control." Because both prerequisites are procedural protections

---

[5]The court also cited cases from the Ninth and Eleventh Circuits in support of its conclusion that "prisoners who have not been convicted of a sex offense have a liberty interest created by the Due Process Clause in freedom from sex offender classification and conditions." *Id.* at 222, 222 n.6.

[6]Although the Court entered its initial findings of fact and conclusions of law on this issue on August 9, 2009, to the extent that order conflicts with this one (if at all), this order shall supersede the former.

the Fifth Circuit has clearly stated are required, the Court finds Plaintiff's constitutional right to procedural due process were violated by the *Coleman* process employed in this case.

The evidence established the following undisputed facts. Plaintiff was released on SISP parole in 2003. In late 2007, the Parole Division—which is responsible for the supervision of parolees and has the authority to recommend the imposition of sex offender conditions on a parolee—initially recommended a review of whether sex offender conditions should be imposed on Plaintiff.[7] In accordance with this recommendation, the Parole Division sent Plaintiff a *Coleman* notice on November 2, 2007. Pursuant to Parole Division policy, the notice informed Plaintiff he had 30 days within which to submit a statement opposing the imposition of sex offender conditions, but did not inform him of a location or time of the hearing to be held on the matter.[8] *See* Def.'s Ex. 4.[9] His

---

[7]The defense of both the Parole Division and the Board was to shift the blame: the Board claimed it was the Parole Division that requested the imposition of the conditions, had control over whether Plaintiff saw the evidence that would be used against him, and enforced the conditions once they were imposed. The Parole Division claimed its employees had no control or input into the hearing or the procedures used by the Board (although its representative personally attended the hearing). For the record, the testimony established the division of responsibilities for the *Coleman* process is generally as follows: the Parole Division is responsible for recommending sex offender conditions be imposed on a particular parolee; assembling evidence as a basis for that recommendation; ensuring the evidence, and a summary of the evidence, are submitted to the Board panel to use in making the decision; having a representative personally present to answer any questions the Board panel may have; and enforcing any sex offender conditions that are imposed by the Board panel after it holds an appropriate hearing and makes the determination an offender is a threat to society by reason of lack of sexual control. The Parole Board is responsible, through its Board panels, for examining the evidence and materials presented by the Parole Division as to a particular parolee at an "appropriate hearing" and making the finding of whether that parolee "constitutes a threat to society by reason of his lack of sexual control" before ordering the imposition sex offender conditions. In no way does the law restrict the Parole Board and the Parole Division from working together in discharging their duties.

[8]Janet Latham, a Program Specialist for TDCJ (from 1999 to 2001 and from 2003 to the present) testified as to the *Coleman* policy in place at the Parole Division in November and December of 2007.

[9]Exhibits in this section refer to exhibits from the August 2009 trial.

objections were to be submitted in writing. Plaintiff was also told he must submit to a sexual evaluation by a "licensed sex offender treatment provider" (in this case, Mr. Stebbins). Plaintiff duly underwent the sexual evaluation by Mr. Stebbins, paying for the evaluation himself, and Mr. Stebbins forwarded a copy of his evaluation to the Parole Division, which would ultimately forward it to the Board panel for it to use as a basis of its decision. However, pursuant to the Parole Division's normal procedure, Plaintiff was not provided with a copy of the evaluation; "[a]s a matter of procedure," Ms. Latham testified, "the parolee is not provided access to or a copy of the evaluation." Nonetheless, Plaintiff timely submitted objections to the *Coleman* notice, and attached a polygraph test, a sexual evaluation done by a Mr. Quijano (a different treatment provider, selected by Plaintiff), and a copy of the proposed lawsuit he intended to file if sex offender conditions were imposed on him. *See* Def.'s Ex. 4. Although his lawyers repeatedly requested access to Mr. Stebbins' evaluation so that Mr. Quijano could analyze and respond to it, neither Mr. Stebbins nor the Parole Division produced the evaluation or allowed Plaintiff to see it until sometime after the *Coleman* review took place. The reason cited for this was confidentiality.

The Parole Division then compiled and forwarded to the Board a packet of information containing all of the information and evidence (including Mr. Stebbins' sexual evaluation, Plaintiff's criminal history, and the materials submitted by Plaintiff) the Board would consider in making its determination of whether sex offender conditions should be imposed on Plaintiff. The packet of information was also accompanied by a written summary—specifically, "a summary of the reasons why the condition is being requested"—prepared by a representative of the Parole Division. That representative, pursuant to the Parole Division's well-established custom, was also sent to the *Coleman*

review[10] conducted by the Board to deliver the summary and personally answer questions. Plaintiff did not receive a copy of the summary, nor was he (or his attorney) allowed to attend the *Coleman* review.

The Board, under Chairperson Owens, was responsible for conducting the *Coleman* review. The evidence at trial showed Plaintiff's *Coleman* review was conducted on December 14, 2007 by two commissioners of the Board, Mr. Thrasher and Mr. Hightower,[11] and was also attended by a representative of the Parole Division. But, pursuant to well-established Board policy, neither Plaintiff nor his counsel were given notice of any hearing or review, nor the opportunity to appear before the voting commissioners who made the determination. The testimony established it is common practice for 30 to 40 cases to be reviewed in one work day—an amount that indicates each review takes approximately12 minutes, assuming the Commissioners conduct an uninterrupted 8-hour workday.[12] Mr. Hightower and Mr. Thrasher ultimately made a finding Plaintiff "has engaged in unlawful sexual conduct and could constitute a threat to society," and therefore voted to impose various sex offender conditions on him, including a requirement that he attend sex offender therapy. Plaintiff was notified of the special conditions by his parole officer on December 17, 2007.

As stated by the United States Supreme Court, the "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v.*

---

[10]The review conducted by the Board panel was referred to during the trial as the "*Coleman* hearing." But it is undisputed the Board panel (at that time) conducted what was essentially a closed administrative review of the parolee's file. Thus, the Court will refer to the procedure more accurately as a "*Coleman* review."

[11]Apparently, pursuant to Board policy, the third member need only be contacted if the first two votes are split.

[12]Not all of the cases reviewed are *Coleman* cases.

*Eldridge*, 424 U.S. 319, 333 (1976). In the present case, because neither the Parole Division nor the Board disclosed to Plaintiff the evidence the Board would rely upon in making their determination, the Court finds it was impossible for Plaintiff to present any meaningful defense or objections to the evidence compiled by the Parole Division. And because neither Plaintiff nor his counsel were allowed to personally appear before the Board, neither they nor anyone else would ever know the basis for the Board panel's ultimate determination, or whether Plaintiff's objections and defenses had been received, much less reviewed, by the voting commissioners in his case. The *Coleman* review conducted in Plaintiff's case was therefore devoid of even the most basic and fundamental procedural protections, as he was given no meaningful opportunity to be "heard" in his objections to the proposed imposition of sex offender conditions and therapy. In short, the review did not comport with even the most minimal requirements of due process and cannot be called an "appropriate hearing," such as is expressly required by the Fifth Circuit.[13]

Furthermore, the undisputed evidence established (unbelievably) that **never** in the entire *Coleman* process was a knowing, explicit finding made by anybody that Plaintiff "constituted a threat to society by reason of his lack of sexual control," as is expressly required under the federal law of this Circuit. Mr. Thrasher, one of the two voting Commissioners in Plaintiff's case and the only one to testify, initially testified—to the Court's stunned disbelief—that he did not know who, if anyone, was to make this finding. He testified that he was not sure whether the licensed treatment provider was (and is) supposed to make the determination, but concluded "well, it's not the Board [that is supposed

---

[13]This Court is cognizant of the difficulties faced by the State in balancing its fiscal and administrative burdens with the rights of the parolees under its supervision. But not a single witness for the Defendants could deny that the expense of making one additional copy of the evidence reviewed by the Board for the parolee, or of allowing a parolee and/or his counsel to make a short, 20-minute presentation of their objections in a *Coleman* case, would pose more than a minimal expense.

to make the finding]." Although he was later recalled to the stand and stated he had been confused on this point (which the Court does not doubt), his recantation showed—at best—that he was substantially confused about the standard he was supposed to apply and the finding he was supposed to make. Perhaps even more importantly, the document which he and Mr. Hightower initialed at the conclusion of the *Coleman* process and which ultimately imposed the sex offender conditions on Plaintiff does not set forth the correct standard. The document only states the Commissioners found Plaintiff had engaged in unlawful sexual conduct and *could* "pose a threat to society." This is an incorrect—and drastically lower—standard than the one that the Fifth Circuit has set forth as required by law.[14]

Likewise, no other official involved in the *Coleman* process ever made the necessary finding that Plaintiff constituted a threat to society by reason of his lack of sexual control. It is undisputed the Parole Division did not make such a finding when it recommended imposition of the sex offender conditions. Bryan Collier, the former Director of the Parole Division, testified he "never knew that a specific finding had to be made." Furthermore, the evaluation of Plaintiff by Mr. Stebbins undisputedly did not make such a finding—in fact, the evaluation specifically stated it did not purport to predict future risk. In short, the Court is forced to reach the obvious conclusion that there has *never* been a considered determination by any official that Plaintiff constitutes a "threat to society by reason of his lack of sexual control."[15]

Based on all of the foregoing, the Court determines as a matter of law that Plaintiff's constitutional right to procedural due process of law was violated by the process used to impose sex

---

[14]Indeed, the Court finds it hard to imagine *any* former felon who could not be considered to pose a "threat to society" in some sense, which renders the standard entirely meaningless (and entirely unrelated to the purpose of imposing the sex offender conditions, which is presumably to target those who may pose some sort of sexual risk).

[15]Of course, the Court considers only the period of time before the August 2009 hearing.

offender conditions on him, as he was not afforded an "appropriate hearing" and no explicit and considered finding was ever made that he constitutes a "threat to society by reason of his lack of sexual control."

Although the Court finds the *Coleman* procedures used in December of 2007 were undoubtedly unconstitutional in light of the *Coleman* decision, the Court intentionally does not set forth exactly what sort of process must be adopted to give Plaintiff (and others like him) the procedural protections to which they are entitled. That job is left to those more suited to the task. The agencies that employ Defendants, not the Court, must ultimately determine which procedures are both feasible and sufficient to protect the important liberty interests at issue in cases such as Plaintiff's. It is their job to balance the competing interests at stake, and formulate specific policies and procedures that comply with the Constitution of the United States. But it is the Court's job to determine whether those policies and procedures comply with the law in each case that comes before it. The Court therefore concludes this section by informing those agencies as emphatically as possible that in this case, they do not.

b.      **Whether Owens is individually liable for the constitutional deprivation**

In Owens' motion for judgment as a matter of law, she argues the evidence of her involvement in making or implementing the policy in question is not sufficient to hold her personally liable under § 1983. *See* Owens' Ren. Mot. JMOL [#205] at 9. The Court agrees.

Under the provisions of 42 U.S.C. § 1983 every person who acts under color of state law to deprive another of constitutional rights shall be liable to the injured party. To have a valid claim under § 1983, Plaintiff must (1) demonstrate a violation of his rights secured by the Constitution or laws of the United States, and (2) demonstrate "that the alleged deprivation was committed by a person acting under color of state law." *Priester v. Lowndes Cty.*, 354 F.3d 414, 421 (5th Cir. 2004). Plaintiff has established the first prong, as this Court has unequivocally held his right to procedural due process was

-15-

violated by the procedures used to impose sex offender conditions on him on December 14, 2007. *See supra*, pg. 8-14. With regard to the second prong, it is undisputed that at all relevant times Owens (and all other defendants) were acting under color of state law. It is hotly disputed, however, whether Owens "committed" the deprivation of Plaintiff's rights such that she may be held personally responsible for it.

It is well-settled Owens cannot be held vicariously liable under § 1983 based only on the actions of her subordinates. *Williams v. Luna*, 909 F.2d 121 (5th Cir. 1990); *Pierce v. Texas Dep't. of Crim. Justice*, 37 F.3d 1146, 1150 (5th Cir. 1994). Thus, in order to hold Owens individually liable for the deprivation of his constitutional rights, Plaintiff must show either that she "was personally involved in the acts causing the deprivation of his constitutional rights," or "that a causal connection exists between an act of [Owens] and the...constitutional violation." *Douthit v. Jones*, 641 F.2d 345, 346 (5th Cir. 1981); *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999).

### (1) Personal Involvement

Plaintiff has not alleged, nor has he produced evidence which tends to show, Owens was personally involved in the deprivation of his constitutional rights. For instance, there was no allegation made or evidence introduced at trial indicating she personally voted to impose sex offender conditions on him using the inappropriate standard and improper procedures, or personally ordered that he not be allowed to attend the Board panel's *Coleman* review, or personally forbid her subordinates from showing him his psychological evaluation. *See* First Am. Compl. [#13]. On the contrary, it was undisputed Owens was not personally involved in the acts causing the deprivation of Plaintiff's rights.

### (2) Causal Connection

Rather, Plaintiff attempted to show at trial that Owens should be held liable because some "causal connection" exists between her actions and the constitutional violation.[16] Such a causal connection may indeed exist in cases where a supervisory official "implements a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind" the plaintiff's constitutional deprivation. *See Thompkins v. Belt*, 828 F.2d 298, 303-4 (5th Cir. 1987). To show individual liability on this basis, a plaintiff must show the official is a policymaking official, and that he or she implemented the policy that caused the plaintiff's injury. *Id.* Whether an official has policymaking authority is generally a question of state law. *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (5th Cir. 1993). The Supreme Court has cautioned "a federal court would not be justified in assuming...policymaking authority lies somewhere other than where the applicable law purports to put it." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988).

Owens testified at trial that her signature on each of the policies promulgated by the Board—including the *Coleman* policy in the present case—is merely a "ceremonial" signature, which appears simply to note the date the policies are effective as approved by the Board. *See* Trial Tr. of October 5, 2009 at 166 ("My signature is simply on the bottom of the policy to note that it was signed and it was passed by the Board."). Owens testified she does not have the power to unilaterally make or modify Board policies; only the entire Board may do so by voting. In fact, Owens testified she does not even vote on the implementation or change of a policy unless there happens to be a tie, in which case she casts the seventh, tie-breaking vote. *Id.* at 169. However, she testified she has never yet had to cast a tie-breaking vote and is therefore certain she did not do so when the Board adopted its

---

[16]In his First Amended Complaint, Plaintiff does not specifically delineate which claims he asserts against Owens in her individual capacity.

*Coleman* policy. Plaintiff, for his part, presented no evidence to counter Owens's repeated affirmations she has no unilateral power to implement or change Board policies.

State law comports with Owens' characterization of her powers. In the Texas Government Code, Owens' position is referred to as the "presiding officer" of the Board. *See* TEX. GOV. CODE § 508.001. The Code states the presiding officer "serves as the administrative head of the board." *Id.* § 508.035(c). The only power given to the presiding officer which could even arguably cast her in the position of a "policymaker" is the power to "establish policies and procedures to further the efficient administration of the business of the board." *Id.* § 508.035(d)(3). But this power is specifically the power to establish policies to further efficient ***administration*** of the Board's business, not the power to establish policies with respect to the business itself. The latter power is expressly reserved for the Board as a whole, as the Code mandates the Board shall "adopt rules relating to the decision-making processes used by the board and parole panels," and may adopt "reasonable rules as proper or necessary relating to...conditions to be imposed on a releasee." *Id.* § 508.036(b)(1); 508.0441(c)(3). Obviously the Code contemplates the Board as a whole will adopt the rules and policies related to the actual decision-making process of the Board and the Board panels and the decision of which conditions ought to be imposed on a parolee. In turn, the three-member Board panels—which are composed of both Board members and parole commissioners—are the entities that actually determine the conditions to impose on an inmate's parole, in compliance with the rules and policies adopted by the Board. *Id.* § 508.0441(a)(2).

Based on the foregoing, Owens does not appear to be a "policymaker" under state law or in her own understanding, although she does admittedly have decision-making power with respect to the administrative functioning of the Board. But this administrative power alone does not make her a policymaker who is individually responsible for implementation of the *Coleman* policies. For

example, in *Bolton v. City of Dallas, Texas*, the Fifth Circuit held a city manager was not a policymaking official where state law repeatedly referred to the city manager's responsibility for "administration" of the city council. 541 F.3d 545, 500 (5th Cir. 2008).[17] The court held those references made it "clear that the position [of city manager] is executive rather than legislative; that is, state law alone does not give to city managers the responsibility for making law or setting policy in any given area of a local government's business." *Id.* (internal quotation omitted). Likewise, Owens's function as the presiding officer of the Board appears to be an executive rather than a legislative one. This is not a distinction without a difference: the Fifth Circuit has long recognized one may be a "decision-maker" without being a "policymaker." *See Rivera v. Houston Indep. School Dist.*, 349 F.3d 244, 247-48 (5th Cir. 2003) (holding under Texas law the Board of Trustees of a school district was the "official policymaker" for purposes of § 1983 liability; although principals and superintendents might have "decision-making authority" under the Texas Education Code, they do not have "the policymaking authority required to sustain liability under § 1983."). As a whole, the evidence was clear and undisputed at trial that Owens did not unilaterally implement the *Coleman* policy, which is the policy that caused the deprivation of Plaintiff's constitutional rights—it was implemented by the Board as a whole. Accordingly, the Court finds Owens did not implement the *Coleman* policies that led to the deprivation of Plaintiff's constitutional rights, and therefore cannot be held individually liable as a policymaking official in this case.

Because Plaintiff did not introduce any evidence at trial showing Owens was personally involved in the deprivation of Plaintiff's constitutional rights or that she implemented the deficient

---

[17]Although the *Bolton* court was considering municipal liability, it is well-settled "the legal elements of an individual's supervisory liability and a political subdivision's liability...are similar enough that the same standards of fault and causation should govern." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994).

-19-

policy that was the moving force behind the deprivation, the only theory left under which she might logically be held individually liable is the theory, alluded to at times during the trial, that she was somehow "deliberately indifferent" to Plaintiff's constitutional rights.

"Deliberate indifference" is a concept which is integral to a few different (albeit related) theories of § 1983 liability. For instance, under a theory commonly referred to as "bystander liability," an officer or prison guard who is present at a scene and does not take reasonable measures to protect a victim from another officer's use of excessive force may be liable under § 1983. *See Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). But mere presence at the scene does not give rise to bystander liability; instead, an officer must have had a reasonable opportunity to realize the excessive nature of the force and a realistic opportunity to stop it in order for a duty to intervene to arise. *Id.* The requisite mental state in situations where a bystanding officer fails to intervene is that of "deliberate indifference." *Terrell v. Castleberry*, 2008 WL 687519 at *5 (S.D. Tex. 2008) (citing *MacKay v. Farnsworth*, 48 F.3d 491, 493 (10th Cir. 1995). Thus, an officer may be liable under § 1983 through a theory of bystander liability if he "(1) knows that a fellow officer is violating an individual's constitutional rights, (2) has a reasonable opportunity to prevent harm, and (3) chooses not to act." *Id.* (citing *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 203-04 (4th Cir. 2002)). The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer. *Id.*

But although "bystander liability" is commonly used in cases where one officer has observed another using excessive force, this Court cannot find a single instance of it being used in this circuit in any other context to hold someone liable under § 1983. The Court declines to be the first to analogize bystander liability to the present, far different context, where the constitutional violation occurred because of the formal policy set by the Board and not because of the rouge action of a

subordinate officer, where that violation was nowhere near as blatant, gruesome, and shocking to the conscience as is the use of excessive force in cases where bystander liability has been applied, and where Owens was a "bystander" only in the metaphorical sense. The Court therefore explicitly rejects bystander liability as a basis upon which Owens may be held individually liable.

However, the Fifth Circuit has also recognized a slightly different "deliberate indifference" theory based on a supervisor's failure to properly supervise his or her subordinates. 15 F.3d 443, 452 (5th Cir. 1994). In *Doe v. Taylor Independent School District*, the Fifth Circuit noted that while supervisory officials "may not be found vicariously liable for the actions of their subordinates under § 1983," they *may* be liable for "deliberate indifference" in cases involving their alleged failure to prevent constitutional violations occasioned by their subordinates. *Id.* (citing *Hinshaw v. Doffer*, 785 F.2d 1260, 1262 (5th Cir. 1986). The court referred to this as "supervisory liability." *Id.* at 453-54. But a supervisor may be personally liable in such cases "only at the point when the [plaintiff] shows that the official, by action or inaction, demonstrates a deliberate indifference to [the victim's] constitutional rights." *Id.* at 454; *and see Smith v. Packnett*, 2009 WL 2168919 at *4, n.1 (5th Cir. 2009). Deliberate indifference is a stringent standard of fault, requiring proof that the official disregarded a known or obvious consequence of his or her action. *See Board of the County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410 (1997).

In *Doe*, the plaintiff (Jane Doe) had sued the principal and the school superintendent after she was sexually abused by her high school teacher. The Fifth Circuit recognized Doe had "clearly" been deprived of a liberty interest recognized under the substantive due process component of the Fourteenth Amendment: her right to bodily integrity. 15 F.3d at 451. Although the principal and school superintendent could not be held vicariously liable for the actions of the teacher, the Fifth Circuit held "school officials can be held liable for supervisory failures that result in molestation of

a schoolchild if those failures manifest a deliberate indifference to the constitutional rights of that child." *Id.* at 455. Specifically, the *Doe* court formulated the following test:

> A supervisory school official can be held personally liable for a subordinate's violation of an elementary or secondary school student's constitutional right to bodily integrity in physical sexual abuse cases if the plaintiff establishes that: (1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student; and (2) the defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and (3) such failure caused a constitutional injury to the student.

*Id.* at 454.

A supervisor who acts with deliberate indifference by failing to train or oversee his subordinates may be held liable under § 1983 in other contexts as well. *See, e.g., Hinshaw v. Doffer*, 785 F.2d 1260, 1262-66 (5th Cir.1986) (applying this standard to a police chief who allegedly failed to train and supervise a police officer). But the plaintiff must show the following: (1) the supervisor failed to supervise or train the subordinate; (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights; and (3) such failure to supervise or train amounted to deliberate indifference. *Batiste v. City of Beaumont*, 421 F.Supp.2d 969, 991 (E.D. Tex. 2005) (citations omitted). For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (citing *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998)).

In the present case, there is no doubt Owens failed to take action when she should have. After the *Coleman* case (which she has never bothered to read in its entirety, although it is all of nine pages in its published form) was issued in 2004, she was on notice as to the procedural due process rights involved in cases of this type, and of the requirement that the Board have an appropriate hearing and

make the correct finding before it imposes onerous sex offender conditions on a parolee. She was sued

in her official capacity numerous times after 2004 based on the Board's *Coleman* policies, for example

in *Meza v. Livingston*, 623 F.Supp.2d 782 (W.D. Tex. 2009) and *Jennings v. Owens, et al.*, 585

F.Supp.2d 881 (W.D. Tex. 2008), neither of which ended favorably for her.

In this particular case, she was sued in her individual capacity on January 2, 2008. The Court

issued an order that same month expressing "grave concerns" over the fundamental fairness of the

proceedings that led to the imposition of sex offender conditions on Plaintiff, and ordered that she (and

the entire Board) be personally served with a copy of the opinion. *See* Order Denying Mot. Temp. Inj.

Relief [#11]. The Court repeatedly reaffirmed this opinion orally in hearings at which Owens was

present. Finally, after declaring the second mistrial in this case, the Court on August 6, 2009 entered

findings of fact and conclusions of law in which it found the *Coleman* review process violated

Plaintiff's constitutional right to procedural due process because the "hearing" given Plaintiff "did not

comport with even the most minimal requirements of due process," and the appropriate finding that

Plaintiff is a "threat to society by reason of his lack of sexual control" had never been made by anyone

throughout the entire process. *See* August 6, 2009 Order [#156]. The Court ordered a hearing be held

for Plaintiff on August 10, 2009. *Id.* It was only then—586 days after this lawsuit was initiated—that

Plaintiff finally received another hearing.[18]

The Board as a whole seems to regard the procedural due process rights at issue in *Coleman*

cases as annoying pests that plague and torment it through no fault of its own. Its strategy thus far has

been to appeal the decisions of numerous federal district courts that have held its policies are

unconstitutional and hope for a different outcome on appeal. But Owens—as the person sued in her

---

[18]That hearing is also the subject of much dispute. The Court makes no comment here about
its adequacy (or lack thereof).

individual capacity in this case and in her official capacity in others—no doubt has been acutely aware of problems with the *Coleman* policies, and had the chance to rectify this particular wrong long ago. But until ordered to, she has done nothing. Her inaction is mystifying, and shows her to be some combination of what the *Doe* court described as "indecisive, insensitive, inattentive, incompetent, stupid, [or] weak-kneed." *See Doe*, 15 F.3d at 465 (Garwood, J., dissenting). The Court finds it deeply concerning that the Chairperson of the Board would take so little personal initiative to ensure important constitutional rights are protected by the agency she represents, even after numerous warnings. Her testimony reveals she relies entirely on her general counsel to read and interpret legal decisions for her, and absolves herself of responsibility for deficiencies at the Board to the greatest extent possible. Her lack of concern for Plaintiff's constitutional rights may even have risen to the level of deliberate indifference, although "[t]he deliberate indifference standard is a high one," and "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and thus do not divest the official of qualified immunity." *Doe on Behalf of Doe v. Dallas Indep. School Dist.*, 153 F.3d 211, 219 (5th Cir. 1998).

But her inaction, however abstruse, does not make her personally liable in this case, as this theory was not properly before the jury: it was not pled by the Plaintiff, and it was not tried by consent. Furthermore, there was absolutely no evidence presented establishing Owens is a "supervisor" in the sense that she is responsible for the training and supervision of her fellow Board members and voting commissioners, and thus there was not sufficient evidence at trial to support this theory of liability. A showing of deliberate indifference by itself—without a concomitant showing the defendant was, for example, a bystander to the use of excessive force, or a supervisor with the responsibility for training and/or supervising the subordinates who committed the violation—simply does not give rise to liability under § 1983.

In his First Amended Complaint, Plaintiff's first mention of Owens is the allegation she "issued a policy directive" that ultimately led to the deprivation of his constitutional rights. First Am. Compl. at ¶ 13.[19] *Id.* The First Amended Complaint goes on to describe the process to which Plaintiff was subjected in accordance with the policies and procedures of the Parole Division and the Board. *Id.* at ¶¶ 14-26. It concludes, "[t]he policies and procedures adopted and implemented by Defendants with respect to the imposition of 'Condition X,' and the manner in which the challenged component of Condition X has been imposed by Defendants, have deprived Plaintiff, and will continue to deprive Plaintiff, of his constitutional right to procedural due process." *Id.* at ¶ (B)(1). Plaintiff does not state any claim against Owens in her supervisory capacity, or allege that (1) she somehow failed to supervise or train her subordinates, (2) a causal connection exists between such failure to supervise or train and the violation of his rights, and (3) such failure to supervise or train amounted to deliberate indifference. His complaint clearly and singularly attempts to hold her liable only as a policymaker, which this Court has found she is not based on the evidence presented at trial.

Furthermore, the issue was not tried by consent. In Plaintiff's counsel's direct examination of Owens,[20] his questions focused exclusively on her role in making policy and the advice she received from counsel. The only testimony which could even arguably go to a failure to supervise or train claim were her answers to questions about whether the *Coleman* case put her on notice that somebody such as Plaintiff must have an appropriate hearing (yes), whether she was served with this lawsuit in January

---

[19]He also states it was "the usual and customary practice of Defendants Owens and Jenkins" to permit parole officers to unilaterally impose restrictions on parolees in their unfettered discretion without the prior approval of a Board panel, *id.*, but this allegation was not expanded upon or proved at trial.

[20]Both sides called Owens during their case-in-chief; thus, the first direct examination was done by Plaintiff's counsel and the second by Defendants' counsel.

of 2008 (yes), and whether the Court entered an order putting her on notice the Court had concerns about the process that was used (yes). Trial Tr. of October 5, 2009 at 174-175. But that evidence also goes to qualified immunity and the reasonableness of the policy which, according to Plaintiff's theory, Owens had implemented. At no time was Owens asked whether she has supervisory authority over the members of the parole panels—which are made up of a combination of Board members and voting commissioners—or whether she is responsible for their training, monitoring, and supervision.

In Owens' direct examination by her own counsel, Owens testified she is the administrative head of the Board, which means she is responsible for establishing caseloads (and making sure they are even across the various offices), giving a report to the Texas Legislature and the governor's office, and voting parole cases. Trial Tr. of October 6, 2009 at 201. She testified the other board members are equal to her in that they are all appointed by the governor, although she is "more or less responsible for them" as the presiding officer. *Id.* at 201-02. Owens testified she does establish administrative policies, or directives, which deal with things like duty days, work hours, travel policy, case loads, etc. *Id.* at 202. But she testified the Board as a whole adopts the policies related to the decision-making processes used by the parole panels. *Id.* at 205. On cross-examination by Plaintiff's counsel, Owens testified she works with staff to organize training groups when new policies and procedures are implemented by the Board. Trial Tr. of October 7, 2009 at 6-7. It is her responsibility as administrative head to make sure these training groups are implemented. *Id.* at 7. But Owens did not testify she has any authority to determine the content of the training; she simply testified she oversees the organization of training groups or workshops when new policies and procedures (adopted by the Board as a whole) are implemented.

After the close of all the evidence, when Defendants rested their case, Plaintiff's counsel made a verbal Rule 50 motion for judgment as a matter of law. Aside from a passing reference to bystander

liability ("she had an opportunity to intervene and prevent or stop the continuing violation of my

client's rights"), he focused continually on Owens' role as a policymaker as the basis of her liability.

Trial Tr. of October 7, 2009 at 67-68. For example, the Court had the following exchange with

Plaintiff's counsel during the presentation of his Rule 50 motion:

> THE COURT: What is your -- give me your best argument since Ms. Owens was not
> a voting member in this case. Your best argument that she was involved in the failure
> to give a constitutional due process hearing to Mr. Graham.
>
> ...
>
> MR. GLADDEN: Okay. There is. Abundant evidence that she was an integral part
> of and an active participant in the formulation and implementation of board policy.
> The question is not whether she could have voted on or not. It was a question of
> whether she was an integral part or active participant. Everything we've heard is that
> she was. That she not only did that but she was the one meeting with lawyers to decide
> how it came up with. She had full knowledge of what the policy said. She said that
> she didn't—take the trouble to even call anybody and suggest that they think about it
> a little harder after she repeatedly received notice of this stuff. It is to some degree not
> only a causation by actions on her part, but causation by omissions on her part that is
> basically where repudiation of the law.

*Id.* at 70-71. This argument focuses exclusively—like Plaintiff's First Amended Complaint does—on

Owens' liability as a policymaker.

In fact, the first time Plaintiff's counsel made any mention of "deliberate indifference" on the

part of Owens was a short time later, when the Court asked another question:

> THE COURT: ...Prior to her being sued in this case and being in the courtroom on two
> occasions, prior to that, what possible legal liability could [Owens] have to Mr.
> Graham?
>
> MR. GLADDEN: She would have liability for, number one,
> formulating—participating.
>
> THE COURT: For signing.
>
> MR. GLADDEN: No –
>
> THE COURT: A policy. There's no evidence she voted for it. There's no evidence she
> voted against it.

-27-

MR. GLADDEN: She's gone on about how she was actively involved in formulating this policy, and she certainly knew about—she either—certainly it was clearly established law that *Coleman* required this finding. She either did or didn't read the opinion or maybe read parts of the opinion, and it appears to me kind of a ***deliberate indifference***, her level of culpability and as far as her being able to—and of course, she was the one that assigned the panels under state law. She was the one who would designate who would be on these panels and she was the one that was having, sponsoring training within the board. It's not like the only thing her only involvement was to come in and sign her name as a clerk would. She's the presiding officer, Judge, of the Board of Pardons and Paroles. She's admitted that she's responsible for engaging in the formulation of policy.

*Id.* at 72-73 (emphasis added). This first vague reference to deliberate indifference, made in the midst of counsel's chaotically jumbled and mostly unintelligible response, was not made until after the close of the evidence.

Thereafter, in its charge to the jury, the Court included the following paragraph in the instructions on Defendants' individual liability:

You are instructed that the Defendant may only be responsible for his or her own act or failure to act—you may not hold the Defendant liable for what other employees did or did not do. But, as I stated above, the Defendant may be liable if there is a "sufficient causal connection" between his or her conduct and the constitutional violation; in other words, if the constitutional violation is affirmatively linked to the action or inaction of the Defendant. Thus, the Defendant may be liable if he or she implemented an unconstitutional policy or practice that was the direct cause of the Plaintiff's injury. ***Likewise, the Defendant may be liable if he or she had actual knowledge of a violation of the Plaintiff's constitutional rights and acquiesced in that violation by failing to intervene to stop or prevent the constitutional violation, so long as it is shown by the Plaintiff that the Defendant possessed a reasonable opportunity to stop, prevent, or rectify the violation, but consciously failed to do so.***

Court's Insts. to the Jury [#193] at 9-10 (emphasis added). The emphasized sentence was added at the request of the Plaintiff. *See* Pl.'s Prop. Jury Insts. [#84] at 6. Owens' counsel objected to its inclusion, arguing "first of all, there's been no deliberate indifference pled in this lawsuit by the First Amended Complaint of the Plaintiff." Charge Conf. Tr. at 13. That objection was overruled, and the sentence was included in the jury charge.

However, after adequate time for reflection and research, the Court finds it should not have allowed the sentence over Defendant's objection because bystander liability was not a theory that was pled or tried by consent, and furthermore was not a theory that properly applied to Owens under the law. Likewise, there was not sufficient evidence of supervisory liability for failure to train or supervise, as the Plaintiff did not even refer to—much less attempt to establish by the evidence—most of the requirements for that theory. It also was not pled or tried by consent.

But the sentence was included, and because there was no evidence Owens was personally involved in the constitutional violation or implemented the policy in question, that single sentence is the only basis upon which the jury could have reasonably concluded from the evidence that Owens is individually liable for the constitutional violation in this case. As the Court finds that sentence was wrongly included in the jury charge, there is left *no* legally sufficient basis upon which the jury could have properly concluded Owens is individually liable.[21] Therefore, the Court GRANTS Owens' motion for judgment as a matter of law on the ground of Owens' individual liability.

c.    **Qualified Immunity**

Because the Court concludes Owens may not be held individually liable for the constitutional deprivation under the pleadings as they stand, the Court does not reach the issue of Owens' qualified immunity. "[Q]ualified immunity is only applicable as a protective shield once a plaintiff has made out a claim against an individual acting in his individual capacity," and Plaintiff has not done so in the present case. *See Goodman v. Harris Cty*, 571 F3d 388, 396 (5th Cir. 2009).

---

[21]The verdict is easily explained as a product of the jury's understandable disgust at the procedures and attitudes of both the Board and the Parole Division. The refusal of both to comply with legal mandates, their constant attempts to blame one another, and their professing they could not do anything about the problem (even something as simple as holding a 20 minute hearing, and giving Plaintiff the information that was to be relied upon beforehand) for some twenty months while this lawsuit languished in court, all necessarily contributed to this verdict.

### d. Emotional Damages

Owens also argues the damages in this case are not supported by the evidence. *See* Owens'
Ren. Mot. JMOL [#205] at 15. The Court does not reach this ground either, as neither Defendant has
properly been found to have individual liability in this case.

### PLAINTIFF'S MOTION FOR ADDITIONAL AND FURTHER EQUITABLE RELIEF [#203] AND FOR ENTRY OF FINAL JUDGMENT [#204]

In his post-trial motion for additional and further equitable relief, Plaintiff dwells on the
second hearing he received, by order of this Court, on August 10, 2009. Specifically, he sets forth
several "objections of constitutional dimension" he has to that August 2009 hearing, including the
"denial of his constitutional right to a neutral arbiter," the panel's failure to enter written findings in
support of its conclusion Plaintiff constituted a threat to society by reason of his lack of sexual control,
and the fact the panel reached its conclusion "on the basis of evidence that was legally insufficient
under a 'clear and convincing evidence' standard." *See* Pl.'s Mot. for Add. Relief at 3. Plaintiff
cursorily requests the Court (1) declare the procedures employed by Defendants in connection with
that hearing "unconstitutional and in violation of Plaintiff's right to Due Process under the Fourteenth
Amendment; (2) declare the decision subsequently made by the Board panel on August 13, 2009
constitutionally void; (3) order that yet another hearing be conducted before a Board panel composed
of neutral arbiters of fact; (4) order any subsequent written decision made by a Board panel concerning
the imposition of sex offender conditions against Plaintiff be accompanied by subsidiary findings of
fact, as well as a written statement of the evidence relied upon by the finders of fact to support any
ultimate conclusion the Plaintiff constitutes a threat to society by reason of his lack of sexual control;
and (5) order that such an ultimate conclusion, and the deliberations engaged in by the finders of fact,
be governed by a "clear and convincing evidence" standard. *Id.* at 4.

The Court is befuddled by these ambitious requests, as they seek remedies for a wrong that is not before this Court. Plaintiff has not requested permission to file a supplemental complaint, nor has he ever sought permission to amend his current complaint to add any allegations concerning the August 2009 hearing. Neither was this issue discussed during the recent trial, or during any of those before it. It has never been the subject of an evidentiary hearing, and Defendants have not filed any motion or response concerning it. Therefore, the only information before the Court concerning this August 2009 hearing are the exceedingly meager allegations set forth in Plaintiff's four-page, post-trial motion for "further equitable relief." That motion is emphatically DENIED.

The determination of whether sex offender conditions should be imposed on Plaintiff—which is what he appears, fundamentally, to be complaining about—is decidedly not within this Court's authority. It is exclusively within the authority of the Board and of the Parole Division. It is undisputed the Defendants have now held a hearing in compliance with the Court's order of August 6, 2009, by giving Plaintiff or his counsel 20 minutes to make an oral presentation before the voting commissioners (with full knowledge beforehand of all the evidence to be relied upon by those commissioners and therefore with the opportunity to make meaningful objections), and by making an explicit determination Plaintiff constitutes a threat to society by reason of his lack of sexual control. The commissioners' reasons for making such a determination, however nefarious they may be, are simply beyond the purview of this Court as long as their procedures complied with the Court's order. It is for the executive and legislative branches of the Texas government to examine or re-examine the system they have implemented, or to remove individual officers who are not capable of performing their duties honorably and well. The Court's only job in this case is to probe that system for constitutional deficiencies. The hearing that was given to Plaintiff in August 2009 comports with the procedural due process requirements set forth *Coleman*: that the parolee have a hearing, and that a

determination be made he constitutes a threat to society by reason of his lack of sexual control. Beyond that, as already explained, the Court has no intention of mandating the exact procedures the Parole Division and Board are required to implement and follow.

## Conclusion

Finally, Plaintiff and Defendant Jenkins have both filed motions seeking the entry of a final judgment pursuant to Federal Rule of Civil Procedure 58(d). The Court GRANTS those motions to the extent they seek entry of a judgment, as a separate judgment will be entered after the entry of this Order.

In accordance with the foregoing,

IT IS ORDERED that Defendant Rissie Owens' Motion for Judgment as a Matter of Law [#205] is GRANTED in part, on the issue of Owens' individual liability. The remainder of the motion is DISMISSED as moot.

IT IS FURTHER ORDERED that Defendant Stuart Jenkins' Motion for Judgment as a Matter of Law [#189] is DISMISSED as moot.

IT IS FURTHER ORDERED that Plaintiff Ray Curtis Graham's Opposed Motion for Permanent Injunction [#203] is DENIED.

IT IS FURTHER ORDERED that Plaintiff Ray Curtis Graham's Motion for Entry of Judgment [#204] and Defendant Stuart Jenkins' Motion to Enter Judgment [#202] are GRANTED to the extent they seek entry of a final judgment in this case.

SIGNED this the _10th_ day of November 2009.

_Sam Sparks_

SAM SPARKS
UNITED STATES DISTRICT JUDGE